[Cite as *State v. C.C.B.*, 2019-Ohio-3631.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 18AP-782 |
| v. | : | (C.P.C. No. 17CR-2534) |
| [C.C.B.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 10, 2019

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Michael P. Walton,* for appellee. **Argued:** *Michael P. Walton.*

**On brief:** *The Law Office of Eric J. Allen Ltd., and Eric J. Allen,* for appellant. **Argued:** *Eric J. Allen.*

APPEAL from the Franklin County Court of Common Pleas

NELSON, J.

{¶ 1} After a jury trial at which the young girl testified, defendant-appellant C.C.B. was found guilty of three counts of raping his stepdaughter A.L. when she was eight years old. The trial court sentenced him to concurrent terms of 15 years to life in prison on each of the three counts.

{¶ 2} C.C.B. now appeals, asserting three assignments of error. He argues first that the trial court erred in not granting his motion to exclude a video recording of the Nationwide Children's Hospital "forensic interview" with A.L., which he says was "merely duplicative" of the live testimony presented at trial. He next argues that the video tape was not subject to any exception under the general rule against hearsay (and perhaps argues, too, that its admission violated his right to cross-examine witnesses against him); the hospital's written report arising from that interview, he further submits, also contained

inadmissible hearsay and may have been confusing in mentioning names of people who did not appear as witnesses at trial. Finally, he says that the state presented insufficient evidence and argues that the weight of the evidence manifestly did not bear out the jury's findings.

{¶ 3} Explaining why we overrule C.C.B.'s assignments of error and affirm his convictions, we begin with his third assignment of error so as to avoid undue repetition of the proof that the jury assessed. For that assignment of error, C.C.B. recites:

> The state failed to produce sufficient evidence to convict the appellant of the crimes contained in the indictment and it was error to over rule [sic] the Rule 29 motion.

Appellant's Brief at 10 (capitalizations altered).

{¶ 4} Although he expresses this assignment of error as resting on a claimed insufficiency of the evidence, C.C.B. argues instead and exclusively that the verdict "is against the manifest weight of the evidence." *Id.* at 10, 11-15. The assignment fails under either formulation: the evidence when viewed in the light most favorable to the state was sufficient to establish the rape convictions, and even if the assigned error included a manifest weight issue, we would not conclude that the jury clearly lost its way so as to create a manifest miscarriage of justice that would require reversal of the convictions.

{¶ 5} In reviewing whether there is legally sufficient evidence to sustain a verdict, " '[t]he relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 9, quoting *State v. McDonald-Glasco*, 10th Dist. No. 17AP-368, 2018-Ohio-1918, ¶ 20 (citations omitted). A manifest weight challenge is different, and asks that we "review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of [the] witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22 (citations omitted). An appellate court should reverse a conviction as against the manifest weight of the evidence "for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *State v. Reed*, 10th Dist. No. 09AP-84, 2009-Ohio-6900,

¶ 24, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997) (which adds, with emphasis in original, that " '[w]eight is not a question of mathematics, but depends on its effect *in inducing belief*") (further citation omitted).

{¶ 6} At trial, A.L. (who by then had turned nine years old) testified that while she had been lying on the living room couch with her stepfather during a nighttime in the previous year, he had stuck "his finger where my bottom was." Tr. Vol. I at 14. She further testified that "he put this thing on his private part and then stick the private part where my private part was." *Id.* at 15. And "[h]e stuck his finger in my private part." *Id.* at 16. At some point, her mother came into the room, she said, and she was dispatched upstairs. When her mother later checked on her and found her not wearing her underwear, A.L. told her mother "that daddy put his finger in my bottom," she testified. *Id.* at 19 (adding on further questioning that she also had said that she had removed her underwear because she had wet it). Her mother went downstairs to speak with C.C.B. after A.L. "told her that daddy put his finger in my bottom, my butt." *Id.* at 19.

{¶ 7} Jennifer Sherfield, a forensic interviewer with the Children's Hospital "child advocacy center or child assessment center" ("CAC"), *id.* at 22, testified that she interviewed A.L. during the early morning of that same day on behalf of the "multi-disciplinary team" of medical professionals, children's services workers, and law enforcement personnel gathered in keeping with standard practice so as to "reduce[ ] the overall amount of the time that the child has to be interviewed" and thereby "reduce the amount of trauma experienced by the child." *Id.* at 28-29. Such an interview, she averred, "shapes how [hospital workers] conduct their medical exam" and informs "treatment of the patient." *Id.* at 30-31. Before the interview, Ms. Sherfield told the jury, a social worker had told her "that mom had found [A.L.] and her dad downstairs, had told her to go upstairs and then [A.L.] wasn't wearing underwear, and so she questioned [A.L.] about what was going on. And she had reported that her dad put his finger in her butt." *Id.* at 45.

{¶ 8} Over defense objection as earlier expressed in a motion in limine, and with the trial judge having advised counsel that the defense thereafter could elect to cross-examine A.L. further about interview statements, *id.* at 50, the videotaped recording of Ms. Sherfield's interview with A.L. was played to the jury. State's Ex. C.

{¶ 9}    In that interview, A.L. recounted that C.C.B. hours earlier had "stuck his hand in my butt," *id.* at 10:00 minutes elapsed time, penetrating her anus with his middle finger and causing her to cry out," *id.* at 11:00.  She further described in some detail C.C.B.'s also having penetrated her vagina using both his mouth, *see, e.g., id.* at 19:25, and his finger, *see, e.g., id.* at 23:23.  She reported that he also had kissed her cheeks, neck, and mouth. *Id.* at 20:45.  She implied her belief that the impending medical examination would confirm her account, *id.* at 27:00, 32:00, expressed concern about possible rectal bleeding, *id.* at 28:00, said that her stepfather had told her that if she was quiet, she wouldn't hurt (which didn't prove to be true, she observed), *id.* at 31:13, said that he told her he was preparing her physically for further anal rape, *id.* at 30:10, and said that while she did not want him to go to jail, she did not want him to do that to her again, *id.* at 29:25.

{¶ 10} Ms. Sherfield's notes of the interview, as contained in the hospital's written report, summarized A.L.'s account that was captured by the video.  State's Ex. C at 13 ("[Patient] reported that [C.C.B.] * * * stuck his finger in her butt"; that he "told her to 'shhh' and kissed her on the cheeks"; that "her dad told her that he was doing this so his thing could fit in her butt"; that "to make it hurt less he tried licking and kissing her thing (indicat[ing] her vaginal area).  [Patient] stated that it didn't hurt less.  [Patient] reported that he also kissed her cheek, neck and lips 'in the mouth' "; that his hand also went inside of her thing * * * [and that] sometimes when he does it harder it stings when she uses the bathroom"; and that "her dad puts lotion (from a round container with a leaf on it) on his middle finger and then he puts it in her butt or her thing/middle part").

{¶ 11} The physical examination conducted after the interview did not reflect physical trauma, but the CAC nurse practitioner who examined A.L. said that her findings did "not negate the child's disclosure of abuse."  Tr. Vol. I at 93 (testimony of Katherine Doughty).  "The majority of the time," the nurse testified, "I would not expect to see injury" as a result of the sort of conduct described; her "medical diagnosis," offered without objection, "was child sexual abuse."  *Id.* at 93, 105.  The nurse collected a rape kit, and included swabs of A.L.'s neck and cheeks because of the account that A.L. had provided.  *Id.* at 98-100.

{¶ 12} Those swabs, analyzed by the state's Bureau of Criminal Investigation, reflected the presence of an enzyme called amylase that is most commonly found in the

highest concentrations in saliva.  Tr. Vol. II, 59-60, 64 (testimony of BCI forensic scientist Brittany Mulinix).  Amylase, too, was found on A.L.'s underwear.  *Id.* at 60 ("Q:  So on the underwear, you found what is most commonly seen in saliva?  A: Correct").

{¶ 13} Further, Hallie Dreyer, a forensic scientist in BCI's DNA unit, analyzed vaginal and anal samples taken from the rape kit that had been collected from A.L.; she examined those findings in the context of DNA material taken from an oral swab of C.C.B.  *Id.* at 20.  Both the vaginal and the anal samples taken from A.L. reflected the presence of male DNA.  *Id.* at 23 (vaginal), 25 (anal).  Ms. Dreyer identified that male DNA in the anal sample through conventional "short tandem repeat" ("STR") DNA testing, which she termed "the gold standard."  *Id.* at 20.  She found male DNA from the vaginal sample after a different form of testing (developed, she said, over the last decade or two) that excludes female DNA from attention and focuses only "on locations that are on the Y chromosome."  *Id.* at 22-23 (describing "Y-STR analysis").

{¶ 14} Moreover, Ms. Dreyer testified, under Y-STR DNA analysis, C.C.B. could not be eliminated as the source of the DNA profile obtained from either the vaginal or the anal sample.  Indeed, while the male DNA profile identified from each would occur in the general population in only one of every 700 males, still that profile could not exclude C.C.B. or his paternal male relatives.  *Id.* at 23 (vaginal sample), 26 (anal sample).

{¶ 15} After the state rested and the trial court overruled a defense motion for judgment of acquittal, the defense called A.L.'s mother A.B. to testify.  She averred that she had gone to bed at about 11:00 p.m.; that she had not heard anything unusual; that at about 3:00 a.m., she had discovered her husband and daughter sleeping on the couch; and that after she told her daughter to go to bed, her husband had carried A.L. upstairs (conduct that she considered unusual, she said on cross-examination).  *Id.* at 98-103, 123.  A.B. further testified that when she went to check on her daughter, "[s]he told me she was okay at first, and then I said, are you sure?  And she said, yeah.  And then I said, what's wrong? And she said, daddy put his finger in my butt. * * * And I said, are you sure?  And she said, yes."  *Id.* at 123 (*see also id.* at 124:  "I felt like something was wrong").

{¶ 16} After talking with her husband ("I asked him about what she told me, and he denied it, of course"), she walked to the nearby police station.  *Id.* at 104.  Advised that among other options, she could take A.L. to the hospital, she returned home and spoke

further with her husband.  He again denied the accusation, and encouraged the trip to the hospital, where he then drove A.B. and A.L.  *Id.* at 105.  Among other matters, A.B. testified that for roughly six months, until about two or three months before this episode, one of C.C.B.'s male cousins had lived with the family and had his clothes washed along with the others'.  *Id.* at 115-16.  She also said that she did not know whether her husband or her daughter was telling the truth.  *Id.* at 140 (redirect).

{¶ 17}  C.C.B. himself also testified, denying any misconduct.  *Id.* at 167.  His account was that he had fallen asleep while his daughter was playing video games, and that he had been woken by the sound of his wife coming downstairs.  *Id.* at 161.  When A.B. said that A.L. needed to be in bed, he had "picked her up like I always do" and carried her upstairs.  *Id.* at 162.  After his wife checked on the girl and then told him what A.L. had said, he denied it and told A.B. "go ahead" when she announced that she was going to the police.  *Id.* at 164.  Similarly, he said, "I wanted to go to the hospital, get her checked out because I knew they * * * would find nothing because I did nothing."  *Id.* at 166.

{¶ 18}  The defense then called its own DNA expert, Julie Heinig.  She testified, among other things, that the enzyme amylase, while "found in our saliva," can also appear in urine, feces, blood, and sweat.  Tr. Vol. III at 8 (adding at 9-10 that a positive result for amylase, while suggesting "the presence of saliva * * * * doesn't definitively state that saliva is there * * * because [amylase] can be found in other body fluids").  She confirmed that "the Y-STR DNA that was * * * detected and analyzed in this case could be from [C.C.B.] or any of his male relatives," *id.* at 13, and said "[i]t's possible" that DNA could be transferred from a towel, for example, to underwear, *id.* at 18 ("[b]ut the more that there's a transfer of DNA, the less you expect [the next time]").  On cross-examination, she agreed that a 700 "yield result[ ]" on a Y-STR DNA test "is pretty high up there."  *Id.* at 28-29.  And she endorsed the BCI findings that the Y-STR DNA tests would not exclude C.C.B.  *Id.* at 37.

{¶ 19}  Ultimately, the jury found C.C.B. guilty of raping A.L., a child of under the age of 10, through the "sexual conduct" of digital-anal penetration (Count 1), digital-vaginal penetration (Count 3), and cunnilingus (Count 5).  *See id.* at 97-98 (jury charge on those three counts); August 17, 2018 Jury Verdict Forms; October 12, 2018 Judgment Entry.

{¶ 20}  Evidence admitted by the close of the state's case was sufficient to sustain a conviction.  The jury had sufficient evidence to support its verdicts of guilty, and C.C.B.

mounts no argument to the contrary. *See* Appellant's Brief at 11-15. The evidence was uncontested that A.L. was younger than ten years old and that she was not the spouse of C.C.B. As to Counts 1 and 3, the in-court testimony of A.L. if viewed in the light most favorable to the prosecution was itself sufficient for the jury to convict. *See, e.g., State v. Wampler*, 6th Dist. No. L-15-1025, 2016-Ohio-4756, ¶ 58 (citation omitted) ("the testimony of a rape victim, if believed, is sufficient to support each element of rape" testified to). As to Count 5, A.L.'s description of the conduct as given at her hospital interview, even without regard to the discovery of amylase on her underwear, also was if viewed in the light most favorable to the prosecution sufficient to permit a rational juror to find guilt beyond a reasonable doubt.

{¶ 21} Moreover, after reviewing all the evidence—including the statements from A.L., who testified in court and was fully available for cross-examination regarding her experience and her same-day reporting of the allegations, and given the physical evidence not only of the amylase on A.L.'s cheeks and underwear but also indicating the presence on the vaginal and anal swabs of male DNA that would exclude most men but not C.C.B.—we could not find that the jury clearly lost its way. The jury had the opportunity firsthand to observe testimony from A.L., and also from her mother, and from her stepfather C.C.B., in addition to testimony from the forensic interviewer, the nurse practitioner, the DNA experts, and other witnesses; we find nothing that compelled the jury to disbelieve A.L. and accept the account of C.C.B.. *Compare State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 21 ("an appellate court 'may not substitute its judgment for that of the trier of fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way' ") (citation omitted); *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43 ("a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version") (citation omitted).

{¶ 22} C.C.B. hinges his manifest weight argument on the DNA evidence, arguing first that it was unreliable because C.C.B. and A.L. "lived in the same home, shared a washing machine and were in close proximity to one another for a long period of time." Appellant's Brief at 11. But the jury was entitled to believe A.L. even without regard to the DNA evidence that buttressed her account. And, furthermore, the jury was not obliged to

accept the defense theory that the results of the vaginal and anal swabs reflected DNA that had mingled in the wash. The competing experts jousted just a bit over how plausible some theory of DNA "transfer" might be in this context, but both gave reasoned answers and the jury was well positioned to assess how best to weigh the DNA findings. *Compare, e.g.,* Tr. Vol. II at 38 (Dryer testimony: "We're talking about vaginal samples and anal samples. These are very intimate samples * * *. You don't typically have DNA being on--for example, DNA to transfer from the underwear to the vaginal cavities. It doesn't really work that way unless there was some sort of body fluid deposited on the underwear which then came in contact with that body orifice") *with* Tr. Vol. III at 35-36 (Heinig testimony: intimate location on the body might not be as exposed to general touch DNA as a hand might be, but while "more difficult," that "doesn't mean it can't happen").

{¶ 23} And C.C.B.'s argument that "DNA [was] not found in the anal sample," Appellant's Brief at 13 (emphasis omitted), and that "IF this story is to be believed, there must be DNA in both places * * * * How does DNA get in the vagina but not the anus?" fails as a matter of fact as well as of logic. *See* Appellant's Brief at 13-15. The state's DNA expert testified that male DNA *was* identified from the anal sample, and that once testing was done to isolate male from female DNA, that male DNA did not exclude C.C.B. or his male relatives (although it would have excluded roughly 699 out of every 700 unrelated men). *See, e.g.* Tr. Vol. II at 26 (Dryer testimony regarding "the anal samples": "Once I am able to ignore that major female DNA was present, I do get a male DNA profile. And that male DNA profile is, again, consistent with [C.C.B.]"). And the defense expert, incidentally, agreed with the B.C.I. findings. Tr. Vol. III at 22, 37 (Heinig testimony endorsing BCI report and agreeing with finding that the "Y-STR DNA that was found cannot exclude [C.C.B.] or his male relatives").

{¶ 24} The major predicate of C.C.B.'s manifest weight argument is wrong, and would be somewhat incidental in any event. We overrule his third assignment of error.

{¶ 25} C.C.B.'s first and second assignments of error are linked by the argument that the video of A.L.'s CAC interview should not have been admitted, and we consider them together. Those assignments recite that:

> [1.] The trial court erred in denying the motion in limine filed by the defense regarding the forensic interview.

[2.] The trial court erred in allowing exhibits [the CAC video and the CAC report] to be admitted over the objection of the defense.

{¶ 26} After a discussion of legal standards and the procedural history of the case, the only argument presented in the "Analysis" section under C.C.B.'s first assignment of error reads in full:  "This information [in the CAC video] was provided to the jury via the testimony of the prosecuting witness.  A second, subsequent piece of testimony via the video of the prosecuting witness was merely duplicative of the testimony and therefore unnecessary and prejudicial." Appellant's Brief at 8 (citing no authority for undue prejudice and making no further record-based argument).

{¶ 27} That argument is inaccurate, for as we have suggested above, the CAC interview was rather more detailed than was A.L.'s testimony at trial (which, for example, did not directly address the allegations relating to Count 5).  It is also unavailing, in that allowing a certain amount of redundancy under these circumstances (and A.L.'s testimony at trial, including direct and cross-examinations, consumed fewer than ten pages of the transcript, *see* Tr. Vol. I at 12-20) did not in and of itself amount to abuse of discretion by the trial court.  *Compare State v. Issa*, 93 Ohio St.3d 49, 64 (2001) (citation omitted) ("trial court has broad discretion in the admission of evidence, and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court"); *State v. Jordan*, 10th Dist. No. 06AP-96, 2006-Ohio-6224, ¶ 9 (hospital social worker's "description of [child victim's] comments during the interview paralleled [the victim's] subsequent testimony at trial"; no abuse of discretion in admitting over hearsay objection); *State v. Sheldon*, 12th Dist. No. CA2013-12-018, 2014-Ohio-5488, ¶ 35 (citations omitted) (child sex abuse context; "cumulative evidence is not necessarily inadmissible").

{¶ 28} "[T]he issue of the admissibility of cumulative evidence is governed by exercise of discretion by the trial court."  *State v. Blankenship*, 10th Dist. No. 80AP-221, 1981 Ohio App. Lexis 14378, *22-23.  C.C.B. has not even tried to explain his contention that what he calls the "merely duplicative" evidence caused him undue prejudice, and "in the absence of any indication of prejudice, exercise [of discretion] by the trial court must be affirmed," *id.*

{¶ 29} The motion in limine as referenced by the first assignment of error, furthermore, was premised not on the interview recording being "merely duplicative" of the live testimony, but rather seems to have been based on the assumption that A.L. would not be available to testify and therefore not be subject to cross-examination. "Because the 6th Amendment guarantees the accused's right to confront those who 'bear testimony', the Confrontation Clause bars admission of testimonial statements unless the witness appears at trial or, if the witness is unavailable, the accused had a prior opportunity for cross-examination * * *," the motion urged. August 5, 2018 Motion in Limine at 2; *see also id.* at 4 (concluding that a full defense "includes the unfettered ability to cross-examine his accuser * * * "). But A.L. did in fact testify at trial, and was cross-examined.

{¶ 30} Indeed, after A.L. had left the stand, and shortly before the recording of the CAC interview was played to the jury, the trial court told the defense that it could question A.L. further on the substance of her statements in the interview:

> These statements are admissible for purposes of the medical diagnosis and treatment. And she was subject to cross-examination. I think that the defense can even re-call her if they wanted to and ask her questions again. She is subject -- was subject to cross-examination, so I am going to permit it.

Tr. Vol. I at 50.

{¶ 31} Binding precedent establishes that where a witness testifies at trial and was subject to cross-examination, the confrontation clause does not bar use of her earlier statements. " '[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it.' " *State v. Lang*, 129 Ohio St.3d 512, 529, 2011-Ohio-4215, quoting *Crawford v. Washington*, 541 U.S. 36, 59, fn. 9 (2004); *State v. Arnold*, 147 Ohio St.3d 138, 155-56, 2016-Ohio-1595 (quoting even more of that passage from *Crawford*); *see also, e.g., State v. Simms*, 10th Dist. No. 10AP-1063, 2012-Ohio-2321, ¶ 42 ("because E.J. testified in this matter, there is no confrontation clause issue here"), citing *State v. Rucker*, 1st Dist. No. C-110082, 2012-Ohio-185, ¶ 37, quoting *Lang*; *State v. Sheldon*, 12th Dist. No. CA2013-12-018, 2014-Ohio-5488 (same effect); *Sheldon v. Marquis*, 2019 U.S. Dist. Lexis 23459 (February 13, 2019 Magistrate's Opinion; agreeing

with 12th District in *Sheldon* on this point, and noting "the video was well-known to defense because it was the subject of the motion *in limine* and defense counsel could readily have extracted cross-examination material from it, assuming this would have been good trial strategy").

{¶ 32} C.C.B. appears to repeat his motion in limine confrontation clause argument regarding the CAC video under his second assignment of error, although as with his first assignment he does not directly invoke constitutional text. "The video * * * was not subjected to cross-examination at the time it occurred" some 14 months before trial, he argues. Appellant's Brief at 9. To reiterate, we are bound by the principle that " 'when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.' " *Lang, supra*.

{¶ 33} C.C.B. fares no better with his argument that the video, and unspecified parts of the CAC report admitted as state's exhibit C, should have been excluded as "hearsay without exception." Appellant's Brief at 9 (adding that "only a portion of [the hospital report] was referred to in live testimony," and that in its 35 "typed pages it contained hearsay without exception * * * * [and] names of individuals who were not called as witnesses and whose inclusion in this report was not explained to the jury"). The Supreme Court of Ohio has held that a child's statements made during a CAC interview that "described the acts [allegedly] performed, including that [the defendant] touched her 'pee-pee,' [and so forth, including touching with hands and mouth] were * * * necessary for * * * proper medical diagnosis and treatment * * * ." *State v. Arnold*, 126 Ohio St.3d 290, 301, 2010-Ohio-2742.

{¶ 34} The Supreme Court has described that "[t]he objective of a child-advocacy center like [this one] is neither exclusively medical diagnosis and treatment nor solely forensic investigation. * * * * Multidisciplinary teams cooperate so that the child is interviewed only once and will not have to retell the story multiple times. * * * * Thus, the interview serves dual purposes: (1) to gather forensic information to investigate and potentially prosecute a defendant for the offense and (2) to elicit information necessary for medical diagnosis and treatment of the victim." *Id.* at 298-300. That is the reason that *Arnold* held that "statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without

offending the Confrontation Clause," while "statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial * * *." *Id.* at 291-92 (case where alleged victim was unavailable to testify).

{¶ 35} *Arnold* places statements about who did what, in what manner, to whom in these contexts in the category of statements made for medical diagnosis and treatment, *id.* at 301, and such statements elicited during the CAC interview process therefore are not "hearsay without exception" under Ohio law.  They fall instead under the evidentiary rule hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing * * * past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."  Evid.R. 803(4).  *See also, e.g., State v. Dever*, 64 Ohio St.3d 401, 414 (1992) ("statements made by a child during a medical examination identifying the perpetrator of sexual abuse, if made for purpose of diagnosis and treatment are admissible pursuant to Evid.R. 803(4) * * * * We thus find that the trial court did not abuse its discretion in admitting [child's] statement identifying  [defendant] as her abuser");  *State v. Muttart*, 116 Ohio St.3d 5, 14, 2007-Ohio-5267 ("regardless of whether a child less than ten years old has been determined to be competent to testify * * *, the child's statements may be admitted at trial as an exception to the hearsay rule pursuant to Evid.R. 803(4) if they were made for purposes of medical diagnosis or treatment"); *Jordan*, 2006-Ohio-6224, ¶ 20 ("[t]he exception set forth in Evid.R. 803(4) extends to statements made to social workers as long as the purpose of the statement is part of initiation of medical diagnosis or treatment.  Statements made by a child identifying the perpetrator of sexual abuse may be pertinent to both diagnosis and treatment, because such statements will assist medical personnel in treating any actual injury and in assessing the emotional and psychological impact of the abuse to formulate a counseling plan or other treatment therefore") (citations omitted, and holding at ¶ 21 that trial court had not abused discretion in admitting interviewer's description of [testifying] child's account).

{¶ 36} Thus, in summary and as we have previously observed, the Supreme Court has "classified information regarding the identity of the perpetrator, the type of abuse alleged, the identification of the areas where the child had been touched and the body parts of the perpetrator that had touched her, as well as the time frame of the abuse, as statements

for diagnosis and treatment because that information allowed the doctor or nurse to determine whether to test the child for sexually transmitted diseases, and to identify any trauma or injury sustained during the alleged abuse." *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 14, citing *Arnold.*

{¶ 37} Here, many of A.L.'s CAC interview statements conveyed directly what she said had happened to her, including where on her body and how she said C.C.B. had inserted his fingers or mouth, or they concerned the pain that she said she had suffered, or they expressed her concerns about bleeding or her hope that treatment was possible. These statements were made at the hospital within hours of when she said the abuse had occurred, and they helped to guide the necessary physical examination that the hospital undertook. Under the governing precedent outlined above, the trial court did not abuse its discretion in admitting all such statements pursuant to Evid.R. 803(4).

{¶ 38} Moreover, and again with regard both to the CAC video recording and the CAC report, C.C.B. does not specify to us or analyze any particular passage, question, answer, or other recorded statement that should have been excised as hearsay outside the scope of the rule. We think that failure alone is basis to overrule these assignments of error. *See, e.g., In re L.W.*, 10th Dist. No. 17AP-587, 2018-Ohio-2099, ¶ 46 ("Appellant fails to identify specific portions of the reports containing, or based on, hearsay evidence. Therefore, appellant has failed to demonstrate the reports were inadmissible * * *."); App.R. 16(A)(7) (requiring appellant's brief to cite to authorities and "parts of the record on which appellant relies"). C.C.B.'s truncated argument here does not assess the medical diagnosis and treatment issue at all, or evaluate any particular portions of the challenged exhibits, and we find his generalized claims unconvincing.

{¶ 39} Here, as in *State v. McKinney*, 10th Dist. No. 13AP-211, 2013-Ohio-5394, ¶ 23, "[t]o the extent appellant's challenges implicate Evid.R. 803(4), which appellant never cites, his argument * * * fails." The lack of specificity is highlighted by his three-sentence reference to the CAC report, at least parts of which he appears to concede were admissible. *See* Appellant's Brief at 9 ("In those typed pages it contained hearsay without exception"). The most salient statements in the report are from the notes of trial witness Jennifer Sherfield recounting her interview with A.L., and at least a very substantial portion of her notes came within that Evid.R. 803(4) exception, *see* state's exhibit C at 13. Other

statements, further reflecting for example the purpose of the hospital visit, "were cumulative of other, properly admitted testimony [* * * *, and] we find any error in their admission harmless" under the particular circumstances of this case and absent any better defined or elucidated argument on appeal. *See McKinney* at ¶ 23; *see also In re C.S.*, 2012-Ohio-2988, ¶ 21 ("[a]s to those statements that are potentially not 'reasonably pertinent to diagnosis or treatment,' * * * we conclude any error which may have occurred by their admission is harmless as such testimony is cumulative of other, properly admitted testimony"), citing among other cases *State v. Arnold*, 10th Dist. No. 07AP-789, 2010-Ohio-5622, ¶ 8 (citing *State v. Conway*, 109 Ohio St.3d 412, 2006Ohio-2815, for point that "[e]rror in the admission of testimony may be considered harmless where such testimony is cumulative of other, properly admitted testimony"). *Compare* Appellant's Brief at 8 (submitting that video of CAC interview was "merely duplicative" of A.L.'s live testimony).

{¶ 40} Finally, we do not agree with any suggestion that the fact that the report "contained names of individuals who were not called as witnesses and whose inclusion in this report was not explained to the jury" posed a sufficient risk of jury confusion to make its admission an abuse of discretion by the trial judge. *See* Appellant's Brief at 9 (citing to transcript pages not relating to report). "The issue of whether testimony or evidence is * * * confusing * * * is best decided by the trial judge who is in a significantly better position to analyze the impact of the evidence on the jury. Thus, this court must affirm the trial court's ruling absent a showing that the trial court acted unreasonably, arbitrarily or unconscionably." *State v. V.J.*, 10th Dist. No. 13AP-799, 2014-Ohio-2618, ¶ 46 (citations omitted).

{¶ 41} We overrule each of C.C.B.'s three assignments of error, and we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT, P.J., and LUPER SCHUSTER, J., concur.