[Cite as *State v. Hardy*, 2024-Ohio-5926.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | : | No. 23AP-651 |
| v. | : | (C.P.C. No. 21CR-1133) |
| Rico A. Hardy, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 19, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Michael A. Walsh*, for appellee. **Argued:** *Michael A. Walsh*.

**On brief:** *Rhys B. Cartwright-Jones*, for appellant. **Argued:** *Rhys B. Cartwright-Jones.*

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Rico A. Hardy, appeals from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas pursuant to jury verdicts finding him guilty of seven counts of rape. For the following reasons, we affirm.

**I. Facts and Procedural History**

{¶ 2} Hardy was indicted on eight counts of rape, one count of menacing by stalking, and two counts of violating a protection order. Prior to trial, the trial court entered a nolle prosequi at plaintiff-appellee's, State of Ohio, request as to Counts 9 through 11 of the indictment—i.e., one count of menacing by stalking and two counts of violating a

protection order.[1]  The case proceeded to a jury trial on the eight counts of rape charged in the indictment.

{¶ 3}  At trial, Jane Doe[2] testified she met Hardy in 2012 and they began a relationship.  Hardy then moved in with Jane and her daughter, Judy Doe, and they lived together for several years.  Jane and Hardy had a child together, I.H., who was born in December 2016.  Jane testified she worked long hours during the period from 2016 through 2020 and Hardy did not work outside the home; therefore, Hardy often watched Judy (and I.H., after she was born) while Jane was at work.  Jane claimed there were no other adults that watched Judy and no other adults were in the house with Hardy when he was watching Judy.

{¶ 4}  Jane admitted that Hardy sometimes left Columbus, including spending portions of 2018 in Erie, Pennsylvania, and portions of 2020 in Arkansas, but claimed Hardy always returned to the home.  Jane asserted Hardy left for a stay in Arkansas on November 16, 2020, and that when she came home from work on November 25, 2020, Judy stated that Hardy had been sexually abusing her.  Jane asserted she "went hysterical" and called Hardy to ask if he had been raping Judy.  (Tr. Vol. II at 187.)

{¶ 5}  On cross-examination, Jane admitted that on the day Judy reported the abuse, Jane and Hardy had been arguing about the long hours Jane was working.  Jane also admitted that Hardy had threatened to report Jane to the department of children services and to report as stolen an automobile that Jane was using but was registered in Hardy's name.  Jane further admitted that she asked Hardy to sign over the deed to their jointly owned home.  Jane claimed she made this request to get Hardy out of their lives.  After Judy divulged the abuse, Jane reported it to the Columbus police department and later took Judy to Nationwide Children's Hospital to be interviewed and examined.  Jane testified that as of the time of trial, she did not have a good relationship with Judy, who now lived with her

---

[1] The judgment entry states that a nolle prosequi was entered prior to trial as to Counts 8 through 11, which would include one of the rape counts. However, the transcript indicates that the state requested dismissal of Counts 9 through 11 prior to trial, and that the trial court granted Hardy's Crim.R. 29 motion as to Count 8 at the end of trial.

[2] Because the child victim in this case and her mother both have the same first and last initials, the parties have referred to the mother as "Jane Doe" and the child victim as "Judy Doe." We will use the same pseudonyms in this decision.

father. Jane also admitted that she had pled guilty to a first-degree misdemeanor charge of falsification in 2015.

{¶ 6} Judy was 15 years old at the time of trial. Judy testified that her mother, Jane, began dating Hardy in 2015. Judy testified about three specific occasions of sexual abuse, one occurring in 2016, one occurring in 2019, and one occurring on November 16, 2020, but also testified generally that Hardy sexually abused her two to three times a week. Regarding the 2016 incident, Judy testified she was watching television in the living room while Jane slept upstairs. Hardy approached her and began touching her breasts. Judy testified that Hardy then took her to the kitchen and compelled her to perform oral sex on him. After it was over, Hardy told Judy he would hurt her if she ever told Jane about what happened. Judy was 8 years old at the time of the incident. Judy testified that after this incident Hardy would reward her with things she wanted, such as a pair of shoes, in exchange for performing sexual acts. Regarding the 2019 incident, Judy testified she was at home with Hardy while Jane was at work. Judy stated she was in the kitchen when Hardy approached her from behind and began touching her bottom, her legs, and her breasts. Hardy compelled Judy to perform oral sex on him. Judy testified Hardy then took her to the couch, where he first placed his mouth on her vagina, then placed his fingers inside her vagina, and ultimately had vaginal sex with her. Judy was 11 years old at the time of the incident.

{¶ 7} Judy testified the final incident of abuse occurred on November 16, 2020, when she was 12 years old. She was at home with Hardy and I.H. while Jane was at work. Judy testified she was in her room watching television at around 9:00 or 10:00 p.m. when Hardy called her into the hallway. Hardy touched her breasts and then took her into his bedroom. Hardy compelled Judy to perform oral sex on him. Hardy then threw her on the bed and had vaginal sex with her before ejaculating onto her hand. Judy testified Hardy made her take a shower and watched as she washed thoroughly. Hardy then left the house before Jane returned from work.

{¶ 8} Judy testified she told Jane about the sexual abuse on November 25, 2020. Judy claimed Jane called Hardy to confront him about the allegations and then called the Columbus police department. Jane later took Judy to Nationwide Children's Hospital, where she was interviewed and examined. On cross-examination, Judy admitted she told

the forensic interviewer at Children's Hospital that the November 16, 2020 incident occurred between 11:00 p.m. and 12:00 a.m.

{¶ 9} Judy also admitted on cross-examination that she was interviewed by a representative of the department of children services on September 18, 2020, two months before the disclosure to her mother, and denied that anyone had ever touched her inappropriately. On re-direct examination, Judy asserted she could not speak freely during the children services interview because Hardy was in the room.

{¶ 10} Ashley Cooley was a forensic interviewer and mental health advocate at the Center for Family Safety and Healing at Nationwide Children's Hospital in December 2020. Cooley testified she had been a licensed social worker since 2017 and had conducted 350 to 400 interviews of sexually abused children. Cooley explained that the forensic interview involved a multidisciplinary team consisting of a physician, a forensic interviewer, a mental health advocate, and possibly others as needed. Cooley testified the forensic interviewer would conduct a one-on-one interview with the child and that a camera recording the interview allowed other members of the team to observe. Cooley also testified the forensic interview would be followed by a medical examination and that the information gathered during the interview would be used in making a diagnosis. Without objection from Hardy's counsel, the trial court designated Cooley as an expert witness on forensic interviewing.

{¶ 11} Cooley interviewed Judy on December 7, 2020; her report of the interview was introduced as an exhibit at trial. Cooley summarized her interview report, testifying that Judy described the November 16, 2020 incident in detail, including describing fondling of her breasts, digital penetration, and oral and vaginal sex. Judy also described the 2016 and 2019 incidents during the forensic interview. Cooley testified Judy spoke clearly and appropriately for a child of her age.

{¶ 12} Dr. Catherine Huber was a child abuse pediatrician who had worked at Nationwide Children's Hospital for five years. Dr. Huber testified to her medical training and stated she had examined hundreds of children in cases of suspected child abuse. Dr. Huber described the processes used at Children's Hospital when there is an allegation of sexual abuse and testified she uses the information provided to her directly by the child and the information provided in the forensic interview in conducting her examination and

making a diagnosis. Without objection from Hardy's counsel, the trial court designated Dr. Huber as an expert witness on child sexual assault examinations.

{¶ 13} Dr. Huber examined Judy on December 7, 2020; her report of the interview was introduced as an exhibit at trial. Dr. Huber testified there were no signs of physical trauma to Judy's genitals, but also testified that the genitals can heal quickly, and that sexual contact may not cause injuries. Dr. Huber further testified that it was possible for a child to be sexually abused for years but have no visible signs of trauma if an examination occurred multiple days after the latest incident. No evidence collection swabs were taken during the examination because of the length of time between the last reported incident and the date of the examination. After examining Judy, Dr. Huber diagnosed child sexual abuse with a normal examination. On cross-examination, Dr. Huber admitted her diagnosis was based solely on Judy's claims of abuse and that there were no physical findings to corroborate those claims.

{¶ 14} At the end of the state's presentation, Hardy's counsel moved for a mistrial, asserting Jane had made comments that were prejudicial to Hardy. Hardy's counsel also moved for acquittal under Crim.R. 29, arguing the evidence was insufficient to sustain convictions. The trial court denied both motions and the trial proceeded to Hardy's defense case.

{¶ 15} Hardy claimed he met Jane in 2014 and they briefly dated; Hardy asserted the relationship ended because Jane had mental health and drug problems. Despite asserting they both dated other people, Hardy admitted he lived with Jane for a time in 2015.

{¶ 16} Hardy asserted he moved out of Jane's home in 2015 and claimed he did not live with Jane consistently during the period between 2016 and 2020. Hardy testified he did not live with Jane in 2016, asserting he was in jail from late-July to mid-September 2016 pursuant to a guilty plea to a drug possession charge. Hardy claimed he lived with his sister in Columbus from the time he left jail until mid-October 2016, when he went to stay in Fort Smith, Arkansas. Hardy testified he briefly traveled to Columbus in December 2016, around the time of I.H.'s birth, and then returned to Arkansas. Hardy testified he returned to Columbus again in March 2017 and lived with Jane for a couple of weeks while attempting to resume a relationship with her. Hardy asserted the attempt to resume the

relationship failed so he moved out and then lived with his sister in Columbus until November 2017 when he returned to Arkansas. Hardy claimed he returned to Columbus in late-July 2018 and began living with Jane again in a house that they purchased together. Hardy testified he lived with Jane in that house for three or four months before they had a falling out and he moved to Erie, Pennsylvania. Hardy claimed he and Jane were not involved in a romantic relationship at the time and that he had his own separate room in the house, which they were trying to sell. Hardy could not recall exactly when he moved to Erie, claiming he "moved out so many times, and she would tell me to come back, she needs me." (Tr. Vol. III at 353-54.) Hardy asserted he was "back and forth" between Erie and Columbus "for maybe a year, ten months, 11 months" before moving back to Columbus in February 2020. (Tr. Vol. III at 355.)

{¶ 17} Hardy testified he was planning to move back to Fort Smith, Arkansas to start a business, and that it was arranged that Breshonna Williams would come to Columbus on November 16, 2020 to help him move. Hardy asserted Jane was aware of this planned move. He testified that he began the morning of November 16, 2020 at a girlfriend's house and at some point went to Jane's house to get his belongings. Hardy claimed he met Williams and her girlfriend, who had driven from Arkansas, at a gas station just before 11:00 p.m., filled the cars with gas, and then went to Jane's house to retrieve his belongings. Hardy asserted they were at the house a brief time loading bags of his belongings, then departed to drive to Arkansas at 11:00 p.m. Hardy claimed they drove straight through and arrived in Fort Smith the following morning.

{¶ 18} Hardy denied ever touching Judy inappropriately or having oral sex or sexual intercourse with her. He testified he believed he had a great relationship with Judy and considered her to be like his daughter, but that the relationship began to deteriorate around the time of the children services interview in September 2020. He denied being in the room with Judy during the children services interview, asserting that would have violated the interview procedure. Hardy testified that he and Jane argued by phone and text message on November 17 and 25, 2020. Hardy claimed these arguments were about Jane not letting I.H. answer his phone calls and leaving Judy and I.H. alone at home without supervision. Hardy asserted that on November 25, 2020, he threatened to report Jane to the department of children services and to report as stolen a car that he owned but was letting Jane use.

Hardy claimed it was during this argument on November 25, 2020 that Jane accused him of raping Judy. On cross-examination, Hardy asserted Jane was trying to blackmail him through false accusations by Judy.

{¶ 19} Williams testified she knew Hardy because he previously dated her mother and she referred to him as "uncle" although they were not biologically related. Williams testified that Hardy had lived in Arkansas for a couple of months in 2016 and again in 2018 when he stayed with Williams's sister. Williams asserted that she and her girlfriend drove from Fort Smith, Arkansas to Columbus on November 16, 2020 to help Hardy move. Williams identified a copy of a text message she sent to Hardy at 10:45 p.m. on November 16, 2020 stating that they were about ten miles away. Williams asserted they met Hardy at a gas station at 10:55 to 11:00 p.m., where he filled their car and his with gas. They followed Hardy to Jane's house, loaded his belongings, and departed on the return drive to Fort Smith. On cross-examination, Williams admitted she did not know where Hardy was or who he was with prior to meeting him at the gas station.

{¶ 20} After presenting his case, Hardy renewed his Crim.R. 29 motion for acquittal. The trial court granted the motion as to Count 8 of the indictment, which was based on a second alleged incident of fellatio on November 16, 2020, mentioned in the forensic interview report, because Judy only testified to one act of fellatio occurring that day. The trial court denied the motion for acquittal as to the remaining counts of the indictment.

{¶ 21} After the jury began deliberating, one juror ("Juror R") approached the jury commissioner to express concern about having seen Hardy standing near an exterior door where jurors entered the courthouse. The trial court conferred with Juror R individually regarding this concern. Juror R indicated he was not intimidated by seeing Hardy standing near the door but was concerned that other jurors might find it intimidating. Juror R stated, "I can see why people don't want to do this, and I should have been like the other people that got off the jury." (Tr. Vol. IV at 446.) Juror R then indicated he felt he could no longer be fair and impartial. He admitted he had discussed the issue with other jurors, but claimed they told him, "it's no big deal, [Hardy] smokes out here all the time." (Tr. Vol. IV at 447.) After conferring with the prosecutor and Hardy's counsel, the trial court removed Juror R from the jury and seated an alternate juror. The trial court then brought the full jury into the courtroom and questioned them about any conversations they had with

Juror R. One juror indicated that Juror R had said something about seeing Hardy outside the courthouse; four or five other jurors indicated they overhead that conversation. The trial court asked whether any of the jurors felt they could not continue to be fair and impartial based on what they heard; none of the jurors indicated any concern about intimidation or inability to be fair and impartial. After seating the alternate juror on the panel, the trial court instructed the jury to restart its deliberations from the beginning. After the jury left the courtroom, Hardy's counsel renewed his motion for mistrial, citing the "cumulative total of all of the issues that we've had from the very beginning." (Tr. Vol. IV at 453.) The trial court denied the motion for mistrial.

{¶ 22} The jury ultimately found Hardy guilty of Counts 1 through 7 of the indictment, each of which charged him with rape in violation of R.C. 2907.02. Following a sentencing hearing, the trial court sentenced Hardy to 10 years to life imprisonment on each count, with the sentences on Counts 1, 2, and 6 consecutive to each other and concurrent with the sentences on Counts 3, 4, 5, and 7, which were concurrent with each other. This constituted a total sentence of 30 years to life imprisonment. The trial court classified Hardy as Tier III sexual offender with lifetime registration duties and in-person verification every 90 days.

## II. Assignments of Error

{¶ 23} Hardy appeals and assigns the following five assignments of error for our review:

> [I.] The trial court erred by admitting the testimonies of Dr. Huber and Ms. Cooley, as they improperly recapitulated the narratives of child declarants, thereby violating Evid.R. 702 and the standards set forth in State v. Arnold as well as the notice and confrontation clauses of the Sixth Amendment regarding the distinction between testimonial and non-testimonial statements.
>
> [II.] The trial court erred by denying the defense's motion for a judgment of acquittal based on insufficiency of evidence, failing to meet the legal standards that evidence must be sufficient for a reasonable trier of fact to find guilt beyond a reasonable doubt.
>
> [III.] The trial court erred by admitting improper character evidence under Evid.R. 404(B), which prejudicially portrayed

the defendant in a negative light unrelated to the crimes charged, thereby compromising the fairness of the trial.

[IV.] The trial court erred in its handling of a juror's concerns regarding potential intimidation by the defendant, which could have influenced the impartiality of the jury, thereby violating the defendant's right to a fair trial under the Sixth Amendment.

[V.] The trial court erred by failing to recognize the cumulative effect of multiple procedural and evidentiary errors, which, considered collectively, deprived the defendant of a fair trial.

## III. Analysis

### A. Admission of expert witness testimony

{¶ 24} In his first assignment of error, Hardy argues the trial court erred by admitting expert witness testimony from Cooley and Dr. Huber. Hardy asserts their testimony improperly recapitulated Judy's narrative in violation of Evid.R. 702 and constitutional protections.

{¶ 25} A witness may testify as an expert when: (1) the testimony relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons, (2) the witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony, and (3) the testimony is based on reliable scientific, technical, or other specialized information. Evid.R. 702; *State v. Quiller*, 10th Dist. No. 15AP-934, 2016-Ohio-8163, ¶ 26. " 'A trial court's ruling as to the admission or exclusion of expert testimony is within its broad discretion and will not be disturbed absent an abuse of discretion.' " *State v. Parker*, 10th Dist. No. 20AP-527, 2021-Ohio-3422, ¶ 14, quoting *State v. Koss*, 10th Dist. No. 13AP-970, 2014-Ohio-5042, ¶ 16. An abuse of discretion occurs when a decision is unreasonable, arbitrary, or unconscionable; however, no court has authority to commit an error of law when exercising its discretion. *State v. Spirnak*, 10th Dist. No. 19AP-261, 2020-Ohio-6838, ¶ 16.

{¶ 26} The trial court admitted Cooley as an expert witness on forensic interviewing and Dr. Huber as an expert witness on child sexual assault examinations. Hardy's trial counsel did not object to the admission of Cooley or Dr. Huber as expert witnesses. "As a general rule, failure to specifically object to the testimony of an expert witness at trial waives

all but plain error on appeal." *Physician's Ambulance Serv., Inc. v. Ohio Dept. of Medicaid*, 10th Dist. No. 20AP-32, 2020-Ohio-6842, ¶ 64. *See State v. White*, 1st Dist. No. C-190589, 2021-Ohio-1644, ¶ 72 (holding defendant waived all but plain error by failing to object to expert witness's opinion testimony that victims had been abused while living with defendant). Plain error occurs when an error is plain or obvious and affects a substantial right. *State v. Robinson*, 10th Dist. No. 20AP-128, 2021-Ohio-3496, ¶ 46. To establish plain error, the defendant must demonstrate an error that is plain on the record and that affected the defendant's substantial rights, such that there was a reasonable probability that the error affected the outcome of the trial. *Id.* In his reply brief on appeal, Hardy concedes that his first assignment of error is subject to plain-error review.

**1. Improper vouching or bolstering of victim's statements**

{¶ 27} Hardy suggests that Cooley and Dr. Huber's testimony exceeded the bounds of admissible expert testimony by improperly bolstering or vouching for the truth of Judy's out-of-court statements in the forensic interview and the medical examination. The Supreme Court of Ohio has held that "an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *State v. Boston*, 46 Ohio St.3d 108, 129 (1989). The court subsequently clarified that its decision in *Boston* did "not proscribe testimony which is additional support for the truth of the *facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis sic.) *State v. Stowers*, 81 Ohio St.3d 260, 263 (1998). Based on these principles, this court has recognized a distinction between direct and indirect bolstering of a victim's credibility and held that only statements directly supporting the veracity of a child witness are prohibited under *Boston. State v. L.E.F.*, 10th Dist. No. 13AP-1042, 2014-Ohio-4585, ¶ 29.

{¶ 28} In a recent decision this court held that a trial court did not plainly err and allow improper bolstering of a child victim's credibility when a forensic interviewer read portions of her interview report into the record. *State v. J.E.*, 10th Dist. No. 22AP-623, 2024-Ohio-4461, ¶ 43-45. We concluded that the challenged testimony described characteristics of how the child victim told her story without commenting on the veracity of what the child disclosed and provided supplemental evidence in support of facts to which the child victim had already testified. *Id.* at ¶ 44. We further held that a trial court did not plainly err and allow improper bolstering when a sexual assault nurse examiner testified

that the child victim's physical exam revealed no abnormal findings and that only 5 percent of children who the alleged type of abuse had an abnormal exam. *Id.* at ¶ 46-48. Rather than testifying about whether the child was telling the truth about her allegations, the nurse's testimony attempted to explain why the lack of observable physical trauma did not mean the child was not sexually abused. We concluded that such testimony did not constitute improper bolstering. *Id.* at ¶ 47.

{¶ 29} Hardy does not cite any specific testimony from Cooley or Dr. Huber that improperly bolstered Judy's credibility. Rather, Hardy appears to generally challenge references by Cooley and Dr. Huber to statements Judy made during the forensic interview and the medical examination. Based on our review of the testimony, we do not find any improper bolstering by Cooley or Dr. Huber. Cooley broadly summarized her interview report and the allegations Judy made but did not directly comment on Judy's veracity. Cooley opined that Judy spoke appropriately for her age and was able to clearly identify her own body parts and Hardy's body parts. Similar to the *J.E.* case, that testimony related to the characteristics of how Judy told her story without commenting directly on the veracity of Judy's statements. *J.E.* at ¶ 44. Dr. Huber testified that Judy's physical examination showed no signs of physical trauma and that it was possible for sexual abuse to occur without evidence of trauma. As in *J.E.*, that testimony was not a comment on the veracity of Judy's allegations; rather, it explained to the jury that the lack of evidence of physical trauma did not disprove sexual abuse. *Id.* at ¶ 47.

{¶ 30} Because we find no improper bolstering by Cooley or Dr. Huber, Hardy has failed to demonstrate plain error arising from the admission of their testimony on that basis.

## 2. Confrontation Clause

{¶ 31} Hardy also argues the admission of Judy's statements during the forensic interview and medical examination through Cooley and Dr. Huber's testimony and reports violated the Confrontation Clause of the Sixth Amendment to the United States Constitution and the protections of Article I, Section 10 of the Ohio Constitution.

{¶ 32} The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The Sixth Amendment Confrontation Clause is applicable in state

prosecutions under the Fourteenth Amendment to the United States Constitution. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). *See Crawford v. Washington*, 541 U.S. 36, 42 (2004) ("We have held that this bedrock procedural guarantee applies to both federal and state prosecutions."). Article I, Section 10 of the Ohio Constitution states that "[i]n any trial, in any court, the party accused shall be allowed to * * * meet the witnesses face to face." The Supreme Court has held that Article I, Section 10 of the Ohio Constitution provides similar protection to the Confrontation Clause of the Sixth Amendment. *See State v. Self*, 56 Ohio St.3d 73, 79 (1990) (concluding that "Section 10, Article I provides no greater right of confrontation than the Sixth Amendment").

**{¶ 33}** The United States Supreme Court has held that out-of-court statements violate the Sixth Amendment when the statements are " 'testimonial' " and the defendant has no opportunity to cross-examine the declarant. *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 13, citing *Crawford* at 68. The court has continued to define the contours of what constitute "testimonial" statements in subsequent decisions. *See, e.g.*, *Ohio v. Clark*, 576 U.S. 237, 244-45 (2015) (describing post-*Crawford* decisions assessing whether certain statements were testimonial).

**{¶ 34}** In *Arnold*, the Ohio Supreme Court addressed whether the introduction as evidence of "out-of-court statements made by a child to an interviewer employed by a child-advocacy center" in a criminal prosecution violates the Confrontation Clause. *Arnold* at ¶ 11. The court ultimately concluded that "statements made to interviewers at child-advocacy centers that are made for medical diagnosis and treatment are nontestimonial and are admissible without offending the Confrontation Clause." *Id*. at ¶ 2. The court further held that "statements made to interviewers at child-advocacy centers that serve primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause." *Id*. Although Hardy does not identify specific statements from Judy's forensic interview or medical examination that he claims were testimonial, he

generally suggests that Cooley's and Dr. Huber's testimony introduced testimonial evidence in violation of the Confrontation Clause.[3]

{¶ 35} Regardless of whether Judy's out-of-court statements during the forensic interview and medical examination were testimonial or non-testimonial, the Confrontation Clause did not bar the introduction of those statements in this case because Judy testified at trial and was subject to cross-examination. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Crawford* at 59, fn. 9. *See State v. Arnold*, 147 Ohio St.3d 138, 2016-Ohio-1595, ¶ 66 (quoting fn. 9 of *Crawford*); *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 113 (same). Consistent with this principle, this court has held that the admission of a child's statements in a forensic interview or testimony about a child's statements in a forensic interview does not violate the Confrontation Clause when the child testifies at trial and is subject to cross-examination. *See*, *e.g.*, *State v. S.A.A.*, 10th Dist. No. 17AP-685, 2020-Ohio-4650, ¶ 15-17; *State v. C.C.B.*, 10th Dist. No. 18AP-782, 2019-Ohio-3631, ¶ 31-32; *State v. Simms*, 10th Dist. No. 10AP-1063, 2012-Ohio-2321, ¶ 42. Because Judy testified at trial and was subject to cross-examination in this case, the Confrontation Clause did not bar the introduction of her prior statements to Cooley and Dr. Huber during the forensic interview and the medical examination.

{¶ 36} Hardy has failed to demonstrate any obvious error in the admission of Cooley and Dr. Huber's testimony, based on improper bolstering or violation of the Confrontation Clause.

{¶ 37} Accordingly, we overrule Hardy's first assignment of error.

---

[3] Hardy argued that Dr. Huber's testimony about using statements from the forensic interview to gather historical information for use in reaching a diagnosis "*appears* to blur the lines between collecting information for medical diagnosis and venturing into the arena of validating the child's narrative, *potentially* contravening the *Arnold* decision." (Emphasis added.) (Appellant's Brief at 20.) Similarly, he asserted that Dr. Huber's use of Judy's statements in reaching a diagnosis "*could be seen* as a use of the forensic interview content not just for health assessment but for corroborating the child's allegations." (Emphasis added.) (Appellant's Brief at 21.) Hardy argued that Cooley's testimony about the details given in the forensic interview "*could* improperly introduce testimonial evidence absent cross-examination opportunities" and that it "*risks* crossing into areas where her testimony may influence the jury by implicitly verifying [Judy's] claims." (Emphasis added.) (Appellant's Brief at 23.) Hardy further argued that Cooley's testimony "*might be seen* as endorsing the veracity of the allegations [and] *could be construed* as bolstering [Judy's] credibility." (Emphasis added.) (Appellant's Brief at 24.)

**B. Sufficiency and manifest weight of the evidence supporting Hardy's convictions**

{¶ 38} Hardy's second assignment of error challenges the sufficiency of the evidence supporting his convictions. Although he purports to challenge the sufficiency of the evidence, the bulk of the arguments Hardy offers in support of the second assignment of error relate to the weight of the evidence supporting the convictions. Therefore, we will consider both the sufficiency and weight of the evidence supporting Hardy's convictions.

**1. Sufficiency of the evidence**

{¶ 39} "Sufficiency of the evidence is a legal standard that tests whether the evidence introduced at trial is legally sufficient to support a verdict." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When reviewing a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. Where the evidence, "if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt," it is sufficient to sustain a conviction. *Id.*

{¶ 40} The jury convicted Hardy of seven counts of rape, in violation of R.C. 2907.02. That statute provides in relevant part that "[n]o person shall engage in sexual conduct with another when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). "Sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶ 41} Count 1 of the indictment alleged that Hardy engaged in sexual conduct with Judy in the form of fellatio on or about February 24, 2016 to February 23, 2017, when she was less than 13 years old. Judy's testimony that Hardy compelled her to perform oral sex on him in 2016, when she was 8 years old, established the elements of rape as charged in Count 1. *See In re T.W.*, 10th Dist. No. 23AP-143, 2024-Ohio-4697, ¶ 21 (finding elements of rape charge established by victim's testimony). Counts 2 through 5 of the indictment

alleged that on or about February 24, 2019 to February 23, 2020, when she was less than 13 years old, Hardy engaged in sexual conduct with Judy in the form of fellatio (Count 2), cunnilingus (Count 3), digital-vaginal penetration (Count 4), and vaginal intercourse (Count 5). Judy's testimony that during the 2019 incident, when she was 11 years old, Hardy compelled her to perform oral sex on him, performed oral sex on her, placed his fingers in her vagina, and had vaginal sex with her established the elements of rape as charged in Counts 2 through 5. Counts 6 and 7 of the indictment alleged that on or about November 16, 2020, when she was less than 13 years old, Hardy engaged in sexual conduct with Judy in the form of fellatio (Count 6) and vaginal intercourse (Count 7). Judy's testimony that on November 16, 2020, when she was 12 years old, Hardy compelled her to perform oral sex on him and had vaginal sex with her established the elements of rape as charged in Counts 6 and 7.

**{¶ 42}** Hardy argues that inconsistencies in Jane's testimony, coupled with her admitted prior conviction for falsification, created significant doubts about her reliability as a witness. Hardy similarly argues that inconsistencies in Judy's testimony suggest potential coaching or manipulation. "Arguments concerning inconsistent evidence and witness credibility are matters relevant to the weight, rather than the sufficiency, of the evidence." *State v. Cervantes*, 10th Dist. No. 18AP-505, 2019-Ohio-1373, ¶ 33. *See State v. Ealy*, 10th Dist. No. 15AP-600, 2016-Ohio-1185, ¶ 16 ("[W]e find that the alleged inconsistencies between [the victim's] pretrial accounts and his trial testimony are matters of weight and credibility, rather than sufficiency."). Therefore, we will address Hardy's credibility arguments in our review of the manifest weight of the evidence.

**{¶ 43}** Hardy also argues there was no physical evidence to corroborate Judy's testimony. However, it is well-established that a victim's testimony alone, if believed, is sufficient to support a conviction for rape and corroborating physical evidence is not required. *State v. K.A.C.*, 10th Dist. No. 23AP-86, 2024-Ohio-1139, ¶ 55. *See State v. Reinhardt*, 10th Dist. No. 04AP-116, 2004-Ohio-6443, ¶ 29 ("There is no requirement, statutory or otherwise, that a rape victim's testimony must be corroborated as a condition precedent to conviction."). As explained above, Judy's testimony alone, if believed, established the elements of rape as charged in each count of the indictment and was sufficient to support the jury's guilty verdicts on those charges.

**2. Manifest weight of the evidence**

{¶ 44} "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *Cassell* at ¶ 38, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 25. When reviewing the weight of the evidence, we "may not merely substitute [our] view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 12, citing *Thompkins* at 387. This authority should be exercised only in the exceptional case where the evidence weighs heavily against the conviction. *Thompkins* at 387. In considering the weight of the evidence, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 45} As noted above, Hardy argues Judy and Jane were unreliable witnesses, citing alleged discrepancies in their testimony. This court has held that "[w]hile our review of the manifest weight of the evidence involves a limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence." *State v. Pryor*, 10th Dist. No. 03AP-1041, 2004-Ohio-4558, ¶ 20. " '[A]n accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented.' " *T.W.* at ¶ 22, quoting *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29. "The jury, as finder of fact, is in the best position to consider inconsistencies in testimony and resolve them accordingly, believing all, some, or none of the witness's testimony." *State v. Robinson*, 10th Dist. No. 20AP-128, 2021-Ohio-3496, ¶ 34. On appeal, Hardy argues that his trial counsel highlighted the alleged inconsistencies in Judy and Jane's testimony, effectively acknowledging that the jury was aware of the alleged inconsistencies and could consider them in weighing the believability

of Judy and Jane's testimony. Hardy does not cite specific inconsistencies in Judy's testimony, instead broadly asserting that "[h]er descriptions of the dates and sequences of the alleged events fluctuated, with discrepancies noted between her court testimony and her earlier statements during interviews and examinations." (Appellant's Brief at 28.) We note there are minor inconsistencies or discrepancies between Judy's forensic interview and her trial testimony, and that the forensic interview contains greater detail than Judy's trial testimony. Hardy suggests the most significant discrepancy was that Judy told the forensic interviewer that the November 16, 2020 incident occurred between 11:00 p.m. and 12:00 a.m. but testified at trial that it occurred between 9:00 and 10:00 p.m. However, the jury was aware of this issue because Judy was asked about it on cross-examination. Moreover, we also note that Judy's account of the incidents in her forensic interview was generally consistent with her trial testimony; therefore, we do not find any of the inconsistencies or discrepancies rendered Judy's testimony unbelievable. *See T.W.* at ¶ 37-38.

{¶ 46} Hardy also argues that his alibi testimony, corroborated by Williams's testimony with respect to the November 16, 2020 incident, outweighed the state's evidence. Hardy asserts the alibi testimony establishes that he was driving away from Columbus, headed toward Fort Smith, Arkansas, between 11:00 p.m. and 12:00 a.m., the same time that Judy told the forensic interviewer the rape occurred. Although Judy admitted making that statement to the forensic interviewer, at trial she consistently testified that the incident occurred between 9:00 and 10:00 p.m. Hardy did not testify as to his whereabouts between 9:00 and 10:00 p.m., and Williams admitted she did not know where Hardy was before she met him at a gas station shortly before 11:00 p.m. Thus, even if the jury believed Hardy's testimony regarding his activities after 11:00 p.m., it could also find that he raped Judy at the time she claimed. Moreover, Hardy's testimony did not conclusively refute Judy's testimony about the 2016 and 2019 incidents. Hardy claimed he did not live with Jane and Judy in 2016, but he only specifically addressed his whereabouts during the second half of that year. If the jury believed Hardy's testimony as to where he lived from late July 2016 onward, it could also believe Judy's testimony about an incident occurring in 2016 and simply conclude it happened at some point earlier in 2016. Similarly, Hardy claimed he lived in both Erie, Pennsylvania, and Columbus during the 10 to 12-month period prior to

February 2020—i.e., most of 2019. Therefore, the jury could have believed Hardy's testimony and also concluded that the 2019 incident Judy described occurred at a time when Hardy was in Columbus living with Jane and Judy.

{¶ 47} Based on our review of the evidence presented at trial, we cannot conclude that in resolving any conflicts in the evidence the jury clearly lost its way and created such a manifest miscarriage of justice that Hardy's convictions must be reversed. Therefore, Hardy's rape convictions were not against the manifest weight of the evidence.

{¶ 48} Accordingly, we overrule Hardy's second assignment of error.

**C. Prejudice arising from improper character evidence**

{¶ 49} In his third assignment of error, Hardy argues the trial court erred by admitting improper character evidence that was unrelated to the charged offenses and compromised the fairness of the trial by portraying him in a negative light. Hardy generally claims that Jane's testimony introduced prejudicial character evidence, however he does not cite any specific portions of Jane's testimony in support of this assertion.

{¶ 50} Generally, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). Under certain circumstances, however, such evidence may be admissible for another purpose. Evid.R. 404(B)(2). During the trial, Hardy's trial counsel objected to Jane's testimony on multiple occasions on the grounds that it constituted improper character testimony.

{¶ 51} When the prosecutor asked Jane when she and Hardy began dating, Jane stated, "I never considered it as dating. I considered it as he, like -- he was a bully, like, he overpowered me." (Tr. Vol. II at 173.) Jane then described the beginning of the relationship:

> Q: What was your relationship like in the beginning, you and Rico?
>
> A: Controlling. I never told him that I wanted to be with him. It's, like, I moved to Columbus by myself, so it was just me and [Judy]. And it was like he, like, pushed his way into, like, he pushed himself on her.

(Tr. Vol. II at 174.) Hardy's counsel objected to this testimony; in a sidebar conference he expressed concern that Jane would "start calling [Hardy] every bad name under the sun"

and claiming he was abusive, which would constitute improper character evidence. (Tr. Vol. II at 175.) The prosecutor indicated he understood those concerns and would try to move the testimony along. At that point, the trial court permitted Jane's testimony to resume and did not provide any limiting instruction to the jury.

{¶ 52} In explaining why she worked long hours, Jane asserted Hardy did not work and claimed he sold drugs. The trial court sustained an objection lodged by Hardy's trial counsel and instructed the jury to disregard the statement. Later in her testimony, the prosecutor asked Jane to describe Hardy's relationship with Judy:

> Q: Can you briefly describe, what was the relationship like between [Judy] and the Defendant?
>
> A: Like a stepfather, very controlling, you know, he made it seem like he had her best interest and he was going to be there for her, like, you know, like buddy-buddy, cool-cool like against mom, like I was wrong and he was right, like I was the bad cop and he was the good cop.
>
> Q: So in the household was it just you; the Defendant; and the two girls, [Judy] and [I.H.]?
>
> A: Yes. That's all he would allow.
>
> Q: Were there any other adults?
>
> A: No. We were isolated. No.
>
> Q: Okay.
>
> A: Isolated.

(Tr. Vol. II at 176-77.) Hardy's counsel objected, and the trial court instructed the jury to disregard Jane's last statement.

{¶ 53} Near the end of her direct testimony Jane became emotional and the trial court took a recess and excused the jury from the courtroom. During the recess, the trial court instructed Jane to limit herself to answering the questions asked by counsel and to stop speaking when an objection was lodged. Hardy's counsel moved for a mistrial, arguing Jane had made numerous statements that constituted inadmissible character evidence with no probative value and that a limiting instruction would be insufficient to limit the damage. The prosecutor argued in favor of a limiting instruction. The trial court acknowledged it

had sustained several defense objections during Jane's testimony but concluded a mistrial was not warranted. After the jury returned to the courtroom, the trial court instructed the jurors to disregard the exchange that occurred before the recess and asked whether any member of the jury felt they could not comply with the instructions to disregard testimony. When none of the jurors indicated they would have a problem following those instructions, the court allowed the trial to resume.

{¶ 54} The transcript demonstrates that the trial court generally *excluded* potential character evidence during Jane's testimony by instructing the jurors not to consider it. Thus, Hardy has failed to establish the trial court erred by admitting improper character evidence. Hardy seems to implicitly acknowledge the exclusion of this evidence but argues the trial court's curative instructions were insufficient to overcome the alleged prejudicial effect of that testimony, citing *Bruton v. United States*, 391 U.S. 123, 129 (1968). However, the testimony at issue in this case was substantially different from *Bruton*, where the admission of a non-testifying co-defendant's confession inculpating the defendant presented a Confrontation Clause violation. *State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, ¶ 93. In this case, Jane's testimony did not present a Confrontation Clause issue and there was "no indication that the jurors could not follow the court's instructions and admonitions." *Id.*

{¶ 55} Hardy ultimately argues a mistrial was necessary because of the prejudicial effect of the testimony. "A trial court must declare a mistrial only 'when the ends of justice so require and a fair trial is no longer possible.'" *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, ¶ 198, quoting *State v. Garner*, 74 Ohio St.3d 49, 59 (1995). We review the denial of a motion for mistrial for abuse of discretion. *Id.*

{¶ 56} Hardy's trial counsel moved for a mistrial several times during the trial and the trial court denied the motion each time. As explained above, when Hardy's trial counsel objected to allegedly prejudicial testimony from Jane, the trial court sustained those objections and instructed the jury to disregard the statements. A jury is presumed to follow a trial court's curative instructions. *State v. Harmon*, 10th Dist. No. 18AP-965, 2020-Ohio-590, ¶ 19, citing *State v. Walburg*, 10th Dist. No. 10AP-1087, 2011-Ohio-4762, ¶ 53, and *State v. Brown*, 10th Dist. No. 15AP-935, 2016-Ohio-7944, ¶ 21. Under the circumstances in this case, Hardy has failed to demonstrate that Jane's testimony had such a prejudicial

effect that a fair trial was not possible. Therefore, we cannot conclude the trial court abused its discretion by denying Hardy's motions for mistrial. *See State v. V.J.*, 10th Dist. No. 13AP-799, 2014-Ohio-2618, ¶ 27 (no abuse of discretion in denying motion for mistrial based on victim's reference to defendant's prior affair, when the trial court sustained an objection to the testimony and instructed the jury to disregard it).

{¶ 57} Accordingly, we overrule Hardy's third assignment of error.

**D. Jury handling following removal of juror during deliberations**

{¶ 58} In his fourth assignment of error, Hardy argues the trial court erred in its handling of Juror R's intimidation concerns and claims this error deprived him of a fair trial. Hardy claims the trial court failed to "effectively neutralize the potential bias" created by Juror R's conversation with other jurors about his intimidation concerns. (Appellant's Brief at 37.) Hardy acknowledges that the trial court questioned the remaining jurors collectively after removing Juror R and received assurances of their impartiality, but he argues that was insufficient to ensure a fair trial free from conscious or subconscious bias arising from Juror R's comments. Hardy effectively argues the trial court erred by denying his renewed motion for mistrial after Juror R had been removed from the jury.

{¶ 59} As explained above, a mistrial is only necessary when a fair trial is no longer possible, and we review the denial of a motion for mistrial for abuse of discretion. *Adams* at ¶ 198. *See State v. Phillips*, 74 Ohio St.3d 72, 89 (1995) ("In cases involving outside influences on jurors, trial court's [sic] are granted broad discretion in dealing with the contact and determining whether to declare a mistrial or to replace an affected juror.").

{¶ 60} Before dismissing Juror R from the jury, the trial court asked him if he had discussed his concerns with any other jurors. Juror R responded, "[y]eah. But they told me that, like -- they was, like, it's no big deal, he smokes out here all the time. I never saw him out there before, so that's why I was concerned." (Tr. Vol. IV at 446-47.) After removing Juror R from the jury panel, the trial court held a colloquy with the remaining jurors:

> THE COURT: Please be seated.
>
> Ladies and gentlemen, good morning. Unfortunately, at this time [Juror R] is no longer able to serve as a juror in the case. We will be bringing up [the alternate juror], and unfortunately that means you'll have to restart your deliberations. Once you

lose a juror, when we replace that juror, you have to start the deliberations all over again.

Now, what I wanted to address and just see, [Juror R] had a situation this morning that he had discussed with the jury commission. He said that he may have talked to some of you about that.

Did any of you talk to [Juror R] this morning about anything that happened with him?

UNIDENTIFIED JUROR: Not prior to the jury room.

THE COURT: Okay. In the jury room did he talk to you all about what happened?

UNIDENTIFIED JUROR: He did mention something - -

THE COURT: Okay.

UNIDENTIFIED JUROR: -- about walking into the court.

THE COURT: He mentioned it to you? How many of you were there when that conversation took place? Okay. Anything about that conversation that the four or five of you overheard, any reason that any of you feel that you could not continue to be fair and impartial in this case based upon that conversation?

UNIDENTIFIED JUROR: Not in my case.

THE COURT: Okay. Everybody feels okay, there was nothing about that conversation that made you feel uncomfortable or any concerns about continuing?

UNIDENTIFIED JUROR: No.

THE COURT: Okay. All right. Counsel, you want to approach?

(Discussion held off the record.)

THE COURT: All right. Just one more question, then.

Is there anyone - - I know I asked you if you could all be fair and impartial. Is there anybody that shares the concerns that [Juror R] shared about continuing or about any interactions that you had with anybody in the case?

UNIDENTIFIED JUROR: No.

(Tr. Vol. IV at 449-51.)  The trial court then brought the alternate juror into the courtroom, seated her on the panel, and instructed the jurors to re-start their deliberations.

{¶ 61} By questioning the jurors collectively, the trial court relied on each juror to assess his or her own ability to be impartial and speak up if he or she had a concern.  No juror expressed any feeling of discomfort or intimidation, or inability to remain impartial, in response to the trial court's questioning.  The Ohio Supreme Court has stated that " '[a] juror's belief in his or her own impartiality is not inherently suspect and may be relied upon by the trial court.' " *State v. Stallings*, 89 Ohio St.3d 280, 297 (2000), quoting *Phillips* at 89.  In *Stallings*, the Ohio Supreme Court held that a trial court did not abuse its discretion by denying a motion for mistrial after an individual approached three jurors who were returning from a lunch break and exhorted them to impose the death penalty on the defendant.  *Id*. at 296-97.  After being advised of the incident, the trial court questioned the three jurors about it.  One juror reported that she did not feel threatened and said nothing to the other jurors, and that it would not affect her ability to be fair and impartial.  The second juror stated that the incident was "somewhat ominous," but that he did not feel threatened and that it would not affect his impartiality.  *Id*. at 296.  The third juror asserted he heard a man say something but was not paying attention and that the incident would not affect his impartiality.  Later that day, the individual who had approached the jurors testified as a witness in the trial.  Following his testimony, the individual told the prosecutor he had only told the jurors to "[d]o the right thing."  *Id*.  On appeal, the Supreme Court concluded the trial court acted properly by questioning the jurors to determine whether the incident had affected their impartiality.  The court further concluded the defendant failed to demonstrate any actual prejudice resulting from the incident.  *Id*. at 297.

{¶ 62} Despite the risk of influence on the jurors arising from the direct communication that occurred in *Stallings*, the court found no abuse of discretion in not denying a mistrial.  In this case, unlike *Stallings*, there was no indication that Hardy approached Juror R or any other juror; rather, Hardy was merely present outside the courthouse in an area near where jurors were entering the building.  Juror R found this concerning and mentioned his concerns to one fellow juror.  A few other jurors overheard the comment.  When Juror R mentioned his concern, other jurors told him it was "no big

deal" because they previously had seen Hardy smoking outside the courthouse. (Tr. Vol. IV at 447.) When questioned by the trial court, none of the remaining jurors expressed any discomfort about Hardy being outside the courthouse or inability to remain impartial based on having heard Juror R's comments. Under these circumstances, we conclude the trial court acted properly by questioning the jurors and relying on their belief in their own impartiality.

{¶ 63} Hardy also asserts the trial court should have taken a "more cautious and considered response" to avoid prejudice and ensure the integrity of the trial, and argues the court erred by "proceed[ing] without rigorously ensuring" that any discussions with Juror R had not tainted other jurors' impartiality. (Reply Brief at 15.) This argument appears to suggest that the trial court should have individually questioned the remaining jurors about whether they were influenced by Juror R's concern for intimidation. However, there is nothing in the record establishing that Hardy's trial counsel requested individual questioning of the jurors or objected to the trial court's failure to do so. Therefore, we find no abuse of discretion in the court's process of questioning the jury collectively and relying on individual jurors to respond if they had any concerns about continuing on the jury. *See State v. Sanders*, 92 Ohio St.3d 245, 252 (2001) (finding no abuse of discretion by trial court in collectively questioning jurors about impact of demonstrators outside the courthouse and concluding trial court "could reasonably assume that those who did not speak up were unaffected"); *State v. Henness*, 79 Ohio St.3d 53, 65 (1997) (finding no abuse of discretion in failing to question each juror individually about being approached by a friend of the victim when the defendant did not request individual questioning).

{¶ 64} Hardy has failed to demonstrate prejudice or that a fair trial was no longer possible due to the trial court's handling of the jury after removing Juror R. We conclude the trial court properly addressed the potential for juror bias under these circumstances and did not abuse its discretion by denying Hardy's renewed motion for a mistrial.

{¶ 65} Accordingly, we overrule Hardy's fourth assignment of error.

**E. Cumulative error**

{¶ 66} Hardy asserts in his fifth assignment of error that the cumulative effect of procedural and evidentiary errors committed by the trial court deprived him of a fair trial.

In support of this assignment of error, he cites the alleged errors specifically raised in his first through fourth assignments of error.

**{¶ 67}** "Under the doctrine of cumulative error, 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.' " *K.A.C.*, 2024-Ohio-1139, ¶ 80, quoting *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 223. As its name suggests, the doctrine of cumulative error requires a finding that multiple errors occurred in the case. *Id.* at ¶ 81. *See State v. Madrigal*, 87 Ohio St.3d 378, 398 (2000) ("[I]n order even to consider whether 'cumulative' error is present, we would first have to find that multiple errors were committed in this case.").

**{¶ 68}** As explained above, we find no merit in the assignments of error Hardy raises on appeal. Because Hardy's individual claims of error lack merit, he cannot establish a right to relief simply by combining those meritless claims. *K.A.C.* at ¶ 81; *State v. Aekins*, 10th Dist. No. 21AP-630, 2023-Ohio-322, ¶ 136.

**{¶ 69}** Accordingly, we overrule Hardy's fifth assignment of error.

## IV. Conclusion

**{¶ 70}** For the foregoing reasons, we overrule Hardy's five assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and BOGGS, JJ., concur.

————————————